UNITED STATES DISTRICT COURT

DISTRICT OF NEW MEXICO

JULIAN R. CARRILLO,

       Plaintiff,

v.                                 CIV 08-0069 JH/KBM

RON TORRES, and
BERNALILLO COUNTY
METROPOLITAN DETENTION
CENTER MEDICAL DEPARTMENT,

       Defendants.

# PROPOSED FINDINGS
# AND
# RECOMMENDED DISPOSITION

Plaintiff Julian Carrillo instituted this § 1983 action for damages when he was incarcerated at the Bernalillo County Metropolitan Detention Center ("MDC"). He claims a violation of his Eighth Amendment rights for delay and denial of medical treatment. *See, e.g., Doc. 1* at 1-2, 7, 9-11 (per CM/ECF pagination, not form page numbers or Plaintiff's pagination). I ordered briefing on a *Martinez* Report, which is now complete. *See Docs. 22, 23, 31, 32.* Notwithstanding the posture of the *Martinez* Report, I recommend that the action

be dismissed with prejudice.

# I.  Initial Clarifications

## A.  *Substitution of CMS for MDC Medical Department*

The two defendants Plaintiff named in the caption of his § 1983 Complaint are Ron Torres, the Warden at MDC, and MDC's "medical department."  *Doc. 1* at 1.  Defense counsel, however, filed the Answer and *Martinez* Report on behalf of Mr. Torres and "Correctional Medical Services, Inc." (hereinafter "CMS").  *See Doc. 21* at 1; *Doc. 23* at 1; *Doc. 32* at 1.  Plaintiff has not realized that he misnamed the medical entity and has not moved to amend/correct/substitute CMS.  He also has not moved to add any other individuals.  Defense counsel has not moved to substitute CMS either.

An initial consideration is whether the caption should be "amended" and CMS "substituted" for the MDC "medical department" absent a motion of the parties.  I have not found any Tenth Circuit authority that either permits or prohibits *sua sponte* substitution, but believe that it is appropriate to do so.

First, defense counsel is defending the suit as if CMS is the proper party.  For example, the *Martinez* Report indicates that CMS is an "independent contractor" that provides medical services to inmates at MDC.  *Doc. 23* at 19.  The affidavit of

2

Dr. William Shannon provides that his title is "Medical Director" for the "Bernalillo County Metropolitan Detention Center" and that he is "employed by" CMS, which "provides medical treatment and care to [MDC] inmates pursuant to contract with the County of Bernalillo." *See Doc. 23-51* at 1.[1]

It is well-settled that a private corporation and its medical personnel who are "employed by [the State] to provide medical services to state prison inmates, act[] under color of state law for purposes of § 1983." *West v. Atkins*, 487 U.S. 42, 54 (1988).

> It is the physician's function within the state system, not the precise terms of his employment, that determines whether his actions can fairly be attributed to the State. Whether a physician is on the state payroll or is paid by contract, the dispositive issue concerns the relationship among the State, the physician, and the prisoner. Contracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody, and it does not deprive the State's prisoners of the means to vindicate their Eighth Amendment rights.

*Id.* at 55-56. There is no suggestion by defense counsel here that CMS is not a "state actor" for § 1983 purposes. In fact, CMS has conceded the same in another case in this district. *See Felix v. Bernalillo County, et al.,* CIV 04-0374 JB/RLP (Doc.

---

[1] Most of the exhibits to the *Martinez* Report consist of one page. For those documents, I will refer to the CM/ECF document number only, rather than, for example, "*Doc. 23-2* at 1."

80 at 5 – "Although CMS is a private corporation, the parties do not dispute that it is a state actor for purposes of § 1983."). And, CMS has expressly been held to be a state actor in cases in other courts. *E.g., Titlow v. Correctional Medical Services,* 2008 WL 2697306 at *4 (E.D. Mich. 2008).

Second, substituting CMS is in keeping with the spirit of the federal rules. In a case where the *pro se* Plaintiff attempted to amend complaint to substitute parties for "John Doe" defendants after statute of limitations ran, the Tenth Circuit noted that Rule 15(c) "exists to protect defendants from unfair prejudice caused by a plaintiff's tardiness in naming them." *Pierce v. Amaranto,* 276 Fed. App'x 788, 792 (10th Cir. 2008). The current version of Rule 15(c) allows amendments to relate back to the date of the original pleading if it involves the same conduct and the newly-added party knew (or should have known) of the mistaken identity, received timely notice of the action, and will not be prejudiced. That is the case here.

Similarly, Rule 25(d) allows predecessor public officers to be substituted by the court at any time but also counsels that any mistake in the parties' identity that does not affect "substantial rights must be disregarded." Here, the situation is analogous to an individual public officer who has been replaced with another person – the MDC "medical center" has been replaced by the independent contractor CMS.

4

Finally, there is precedent from other courts to *sua sponte* substitute the

proper party under the predecessor version of FED. R. CIV. P. 15(c), or proceed to

the merits of the case without substitution under FED. R. CIV. P. 25(d).[2]

Substituting CMS and proceeding to the merits without further ado will promote

judicial efficiency and clear up the current confusion reflected by the caption and

docket entries. Accordingly, I will request the Clerk to make the substitution.

### B. *This Case Does Not Involve State Law Claims*

There are a number of medical records submitted with the *Martinez* Report,

---

[2] *See Navarro v. UIC Medical Center,* 165 F. Supp. 2d 785, 786 (N.D. Ill. 2001) ("It should be made clear at the outset that *pro se* plaintiff Navarro's mistaken (but understandable) error in naming the correct defendant is not fatal. It is quite true that the Medical Center is not a suable entity as defense counsel asserts, but Rule 15(c) expressly permits the making of a change to name the proper party defendant, and that same Rule provides for relation back of that change to the date of Navarro's original Complaint. This Court is simply treating the Complaint *sua sponte* as having been amended by substituting the already-mentioned Board of Trustees for UIC Medical Center wherever the latter name appears."); *Sisneroz v. California,* 2009 WL 302280 at *6 & n.9 (E.D. Cal. 2009) (court instructed respondent to name a proper party substitute, but habeas petitioner named wrong successor and court substituted wrong party; later court determined that it could proceed to merits – because "[f]ormalizing a substitution of the [proper party] would not affect 'the parties' substantial rights,' and any 'misnomer' of this nature 'must be disregarded.' Rule 25(d). The Court accordingly finds no jurisdictional impediment to reaching the merits of the Petition on party misnomer grounds or need to *sua sponte* order a substitution, and Respondent's objection is OVERRULED as a ground to deny the Petition."); *Johnson v. Liberty Life Assur. Co. of Boston,* 2007 WL 1188350 at *1, n.1 (W.D. Okla. 2007) ("The defendant states in its brief that the plaintiff misnamed it in the complaint, but has failed to correct the error. The court *sua sponte* amends the complaint to identify the proper party defendant. *See generally* Fed.R.Civ.P. 15(c)(3). If the plaintiff objects to this change he is directed to file an objection within three days."); *Gallaher v. Hartford Life & Acc. Ins. Co.,* 2007 WL 1575508 at *1, n.1 (W.D. Pa. 2007) ("Throughout this case, Hartford has been incorrectly identified in the caption as Hartford Life Insurance Company. The Court now *sua sponte* corrects that misnomer. Fed.R.Civ.P. 15(c)(3).").

but only two affidavits refer to them.  One is from the CMS Director of Nursing for MDC, which authenticates the medical records and does not discuss the content of the records.  *See Doc. 23-50.*  The other is from Dr. Shannon, which also does not make any observations about the content of the records other than to state that he

> 5.     . . . has reviewed the medical records of Julian Carillo (sic) attached to defendants' Martinez Report [and];
>
> 6.     That the medical care and treatment reflected in those records indicates that plaintiff's medical treatment *at no time fell below the accepted standard of care* and, in fact, *either met and/or exceeded the appropriate standard of care* for correctional institutions.

*Doc. 23-51* (emphasis added).

Dr. Shannon's affidavit focuses on the "standard of care" for one apparent reason.  Defense counsel argues that "to the extent Plaintiff is alleging medical malpractice or negligence" against CMS, state law requires a plaintiff come forward with expert testimony showing that the standard of care he received fell below the recognized standards in the medical community.  *Doc. 23* at 15.

Dr. Shannon's comments about the standard of care and state law evidentiary burdens are beside the point because state common law negligence and medical malpractice are not at issue here.  As I mentioned in ordering the *Martinez*

Report, this is prisoner civil rights case that involves allegations of Eighth Amendment violations. *See Doc. 22* at 1. Even though Plaintiff makes the occasional reference to "negligence," *see, e.g., Doc. 1* at 9, his Complaint is construed as raising only the Eighth Amendment because state common law cannot be the basis for recovery under § 1983:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities *secured by the Constitution and laws,* shall be liable to the party injured

42 U.S.C. § 1983 (emphasis added).

As the Tenth Circuit recently reiterated:

> Claims under § 1983 are often analytically similar to – although still distinct from – common law torts . . . In some instances, a common law tort is sufficiently analogous to the alleged constitutional violation that its common law elements are grafted onto and themselves become elements of a § 1983 constitutional tort. But not all § 1983 actions have a common law analog, and no § 1983 action depends entirely on a common law analog to define its elements. The core inquiry under any § 1983 action, regardless of the analogous common law tort, is whether the plaintiff has alleged an actionable constitutional violation.

*Becker v. Kroll,* 494 F.3d 904, 913-14 (10th Cir. 2007).

7

In addition, the Eighth Amendment standards, set forth in more detail below, do not permit recovery for conduct that amounts to negligence or malpractice so "standard of care" is not a consideration.

## C. § 1983 Liability Cannot Be Predicated On Vicarious Liability

The *Martinez* Report correctly identifies that a prison warden cannot be held individually liable under a "vicarious" or "supervisory" liability theory.  "'Individual liability under § 1983  must be based on personal involvement in the alleged constitutional violation.'"  *Fogarty v. Gallegos,* 523 F.3d 1147, 1162 (10th Cir. 2008) (quoting *Foote v. Spiegel,* 118 F.3d 1416, 1423 (10th Cir. 1997)).  Moreover, a "theory of negligent supervision cannot provide a basis for liability under § 1983." *Spencer v. Landrith,* 2009 WL 468291 at *2 (10th Cir. 2009) (citing *Darr v. Town of Telluride,* 495 F.3d 1243, 1256 (10th Cir. 2007)).  Likewise,

> "there is no concept of strict supervisor liability under section 1983." *Jenkins v. Wood,* 81 F.3d 988, 994 (10th Cir. 1996) (quotation and citation omitted).  "[I]t is not enough for a plaintiff merely to show a defendant was in charge of other state actors who actually committed the violation." *Id.*  Rather, "the plaintiff must establish a deliberate, intentional act by the supervisor to violate constitutional rights." *Id.* at 994-95 (quotations and citations omitted).

*Id.*

It is plain from the face of the Complaint, that Plaintiff seeks to hold the MDC "warden" (Defendant Torres) liable under a supervisory liability only.  *See Doc. 1* at 1.  He asserts that MDC's "medical staff" and "corrections" officers are responsible for the alleged constitutional violations, *see id.* at 2, 7, 9, and that "staff [are] under the Warden's administration," *id.* at 2.  Nothing in the *Martinez* Report shows or even suggests personal involvement by Defendant Torres in any medical affair.  Thus, the claims against him in his individual capacity should be dismissed.

Defense counsel takes the position that CMS is the sole "medical provider" for inmates at MDC and Defendant Torres does not supervise the medical staff who treat MDC inmates.  *See Doc. 23* at 14, 19; *see also Doc. 23-51* (affidavit of Dr. Shannon stating "Ron Torres is not a medical provider, nor does he supervise any of the CMS medical staff" at MDC).  I need not resolve this factual issue.

To the extent Plaintiff is suing Defendant Torres in his official capacity, liability cannot be imposed unless the constitutional violation is the result of a "policy or custom."  E.g., *Spencer,* 2009 WL at *2 (citing *Novitsky v. City of Aurora,* 491 F.3d 1244, 1259 (10th Cir. 2007), *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1177 (10th Cir. 2003), and *Myers v. Okla. County Bd. of County Comm'rs,* 151 F.3d 1313, 1316 (10th Cir. 1998)).  The same is true of CMS.  It cannot be cannot be held vicariously liable under § 1983 liability for the

unconstitutional acts of its medical staff.

> In *Monell,* the Supreme Court held that a municipality
> cannot be held liable under 42 U.S.C. § 1983 merely on
> account of the unauthorized acts of its agents. *Monell [v.
> Department of Social Servs. of City of New York],* 436 U.S.
> 658, 691 (1978). While it is quite clear that *Monell* itself
> applied to municipal governments and not private
> entities acting under color of state law, it is now well
> settled that *Monell* also extends to private defendants
> sued under § 1983. *See e.g., Dubbs v. Head Start, Inc.,* 336
> F.3d 1194, 1216 (10th Cir. 2003) (collecting circuit court
> cases)[, *cert. denied sub nom,* 540 U.S. 1179 (2004)]. As
> such, a private actor such as CCA [Corrections
> Corporation of America] "cannot be held liable solely
> because it employs a tortfeasor – or, in other words . . .
> cannot be held liable under § 1983 on a *respondeat
> superior* theory." *Monell,* 436 U.S. at 691 (emphasis in
> original). Therefore, in order to hold CCA liable for the
> alleged tortious acts of its agents, Ms. Smedley must show
> that CCA directly caused the constitutional violation by
> instituting an "official municipal policy of some nature,"
> *id.,* that was the "direct cause" or "moving force" behind
> the constitutional violations. *Pembaur v. City of
> Cincinnati,* 475 U.S. 469, 480-85 (1986); *City of
> Oklahoma City v. Tuttle,* 471 U.S. 808, 820(1985).

*Smedley v. Corrections Corp. of America,* 175 Fed. App'x 943, 946 (10th Cir. 2005).

Like CCA in the *Smedley* decision, *Monell* liability has been expressly applied

to CMS:

> A private entity employed by the state to provide medical
> services to its prison inmates may be sued under § 1983
> as one acting "under color of state law." *West* . . .
> Defendant CMS, however, cannot be held vicariously

10

> liable under 42 U.S.C. § 1983 for the conduct of its
> agents on the basis of *respondeat superior.* "CMS,
> although clearly a state actor and therefore a proper party
> to this § 1983 action, cannot be held vicariously liable
> for the actions of its agents, [ ]on a *respondeat superior*
> basis. Hence, CMS's liability must also be premised on
> some policy that caused a deprivation of [plaintiff's]
> Eighth Amendment rights." *Starcher v. Correctional
> Medical Systems, Inc.,* 7 Fed. Appx. 459, 465 (6th Cir.
> 2001). . . *Street v. Corrections Corporation of America,* 102
> F.3d 810, 818 (6th Cir. 1996).

*Titlow,* 2008 WL 2697306 at \*\*4-5; *see also Felix v. Bernalillo County, et al.,* CIV 04-

0374 JB/RLP (Doc. 80 at 5 – "The parties also do not dispute that the *Monell*

analysis applies to CMS. Thus it is significant that Mrs. Felix does not sue an

individual employee at CMS, but only the corporation.").

Plaintiff makes no allegation of a policy or custom underlying the treatment

he received and nothing in the *Martinez* Report shows or even suggests a policy or

custom at issue. Thus, the claims against CMS should also be dismissed.

## II.  Eighth Amendment Analysis

Although no individual medical staff or correctional officers have been

named as defendants, in an abundance of caution and in the interest of fully

resolving this matter, I will also discuss the Eighth Amendment claims. I find that

the claims have no merit.

## A.  *Eighth Amendment Standards*

"It is well established that prison officials violate the Eighth Amendment if their 'deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain.' . . .  'This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care.'" *Kikumura v. Osagie*, 461 F.3d 1269, 1291 (10th Cir. 2006) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976)), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007); *Mata v. Saiz*, 427 F.3d 745, 753 (10th Cir. 2005) (same).  A "medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Mata*, 427 F.3d at 751 (internal quotations and citation omitted); *see also Kikumura*, 461 F.3d at 1292 (same).

Nevertheless, "'[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner" and a "complaint about 'an inadvertent failure to provide adequate medical care' or 'that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim

of medical mistreatment under the Eighth Amendment.'" *Kikumura,* 461 F.3d at 1291 (quoting *Estelle,* 429 U.S. 97, at 105-06); *see also Mata,* 427 F.3d at 751 (same).  Likewise, a prisoner's disagreement with the course of treatment prescribed and given by medical staff does not arise to a claim of Constitutional dimension. *E.g., Fitzgerald v. Corr. Corp. of Am.,* 403 F.3d 1134, 1142 (10th Cir. 2005); *Perkins v. Kan. Dep't of Corr.,* 165 F.3d 803, 811 (10th Cir. 1999).

Plaintiff alleges that MDC "staff . . . intentionally neglected their duties in responding to a medical emergency" and that the MDC "medical department . . . did and intentionally neglected their duties and responsibilities in attending to immediate care and . . . following instructions from" the University of New Mexico Hospital ("UNM").  *Doc. 1* at 7 (spelling and grammar corrections supplied).  His specific allegations fall into three categories – the initial delay in receiving his knee brace, *id.* at 9-10, the followup care after treatment for a hand injury at UNM, *id.* at 10-11, and failure to provide him with an orthopedic visit after he injured his ankle, *id.* at 11.

## B.  Delay In Providing Knee Brace

According to Plaintiff, he tore the "ACL" in his right knee in 1992, injured the same knee several times thereafter, and underwent surgery in 2002.  *See Docs.*

*23-10, 23-11.*  When he was not in prison, he apparently used a "Bleadsoe" brace, and had his family deliver it to the prison at some point.  *See Docs. 23-5, 23-10, 23-15, 23-53* at 2.  "Bleadsoe" braces are sophisticated contraptions that stabilize a knee like a cast would, but are hinged so that the knee can bend.  *See* http://www.bledsoebrace.com/.

The summary discussion of the medical records in the *Martinez* Report suggests that medical staff were unaware of a problem with Plaintiff's knee until May 2007 when he filed his first grievance.  It appears that when he was initially processed into MDC in January 2007, Plaintiff neglected to report that condition or that he used a brace.  For example, he reported that he was taking, among other drugs, "Vicodin 500 mg 3x day," but answered "no" to questions asking whether he had:  a "medical problem that requires immediate attention;" "seen a doctor in the past six months," or "splint, crutches, cast or brace that you need while you are here."  *Doc. 23-2.*  He responded "yes" to questions asking whether he had been in MDC before, and whether he had "any medical problems we should know about," but only mentioned depression, acid reflux, and an ibuprofen allergy.  *Id.*  The person who completed the intake form also "observed" that Plaintiff used tobacco.  *Id.*

Despite Plaintiff's initial failure to mention the condition and despite the fact

14

that the *Martinez* Report does not document Plaintiff's early medications, the medical records reveal that medical staff <u>was</u> aware of the knee condition and brace soon after his incarceration.  On the other hand, these records also establish that medical staff did not hesitate to respond to the knee condition with medicine and other allowances.

For example, although Plaintiff evidently was permitted to continue taking Vicodin, he was switched to "Tramadol" upon his arrival at MDC.  *See Doc. 23-10.* Tramadol is a potent and potentially abused pain reliever like Vicodin and is prescribed for pain.[3]  On February 12, 2007, only a few weeks after entering prison, Plaintiff asked a nurse to check on his "knee brace & [illegible] left by my family." *Doc. 23-5.*  The nurse did check but found "no record at this time," evidently

---

[3] *See* www.medicinenet.com/tramadol/article.htm ("Tramadol . . . BRAND NAME: Ultram . . . is a man-made (synthetic) analgesic (pain reliever).  Its exact mechanism of action is unknown but similar morphine [because it] binds to receptors in the brain (opioid receptors) that are important for transmitting the sensation of pain . . .  Tramadol, like other narcotics used for the treatment of pain, may be abused.  Tramadol is not a nonsteroidal antiinflammatory drug (NSAID) and does not have the increased risk of stomach ulceration and internal bleeding that can occur with NSAIDs. . . . Tramadol is used in the management of moderate to moderately severe pain."); www.medicinenet.com/hydrocodoneacetaminophen/article.htm ("hydrocodone/acetaminophen . . .  BRAND NAMES: Vicodin . . .  Hydrocodone is a narcotic pain-reliever and a cough suppressant, similar to codeine [that] blocks the receptors on nerve cells in the brain that give rise to the sensation of pain.  Acetaminophen is a non-narcotic analgesic (pain reliever) and antipyretic (fever reducer). . . . Frequently, hydrocodone and acetaminophen are combined to achieve pain relief, as in Vicodin . . . Hydrocodone may be habit forming.").

meaning that the brace had not yet been delivered by Plaintiff's family.  *Id.*[4]  On

February 19, 2007, Plaintiff was seen by a nurse for "TB screening," and was

examined at that time.  His "reflexes" were "aaox4 ⊕ reflexes" and his "extremities

were "⊕ edema ⊕ ROM."  *Doc. 23-6.*  Although these examination notes do not

specifically mention knee pain and suggests no problems with Plaintiff's legs, the

very same day, "medical" sent a "referral form" to "security" indicating that for 90

days, Plaintiff "may use 2d boat," *"may use brace,"* and *"bottom bunk."  Doc. 23-3*

(emphasis added).  Nothing in the *Martinez* Report suggests that a condition other

than knee problems warranted authorizing these medications and allowances.[5]

There is nothing in the record that establishes when Plaintiff's brace was

received by the prison.  For example, about the time the ninety-day allowances

were due to expire, "medical" sent another "referral form" to "security" on May 8,

2007, indicating that Plaintiff was to be permitted to use a "bottom bunk or 2

boats," this time for the "duration of [his] stay."  *Doc. 23-9.*  It did not mention a

"brace" as did the initial authorization.  Plaintiff did not mention his knee brace

---

[4]   That is how counsel interprets the notation.  *See Doc. 23* at 2 ("No record of such a brace was located at that time.").

[5]   Counsel simply avers that these three authorizations were alternatives – Plaintiff could either "use 2 'boats' (plastic, stackable bed frames), a brace or to sleep in a bottom bunk for 90 days."  *Doc. 23* at 2.  The medical record is not clearly written in the disjunctive.

until May 22, 2007, when he complained to a nurse that: his knee "locked up;" when he was on the "outside" he used an "ACL metal brace;" he had a history of "knee problems torn ACL in 1992 reinjured several times since;" on the "outside" he used Vicodin; and that the "Tramadol" he was currently prescribed was not even "touching pain." *Doc. 23-10.*[6] The nurse observed that the knee was "swollen," with a "limited range of motion," and that Plaintiff could not "extend leg or bend @ knee." *Id.* He was prescribed a five-day supply of Naprosyn for the inflammation,[7] and his "chart" was to be "referred" to "provider for review." *Id.* The same day, "medical" sent a "referral form" to "security" authorizing that for thirty days Plaintiff was to "house on lower level [with] lower bunk," because the same was "medically indicated." *Doc. 23-9.* The next day, May 23, 2007, Plaintiff was seen by another nurse for his complaints of his knee locking up. The nurse also noted swelling in the knee and that Plaintiff was limping, and the "plan" was to

---

[6] This medical record mentions the left knee, whereas the rest of them mention the right knee, including the medical visit the very next day. *See, e.g., Docs. 23-11, 23-13, 23-14.* It is unclear whether the left knee notation is a mistake or whether both knees were troublesome.

[7] Plaintiff listed an allergy to ibuprofen and this drug is in the same class, but there is no allegation or record showing that he had an adverse reaction to Narposyn. *See Docs. 1, 31; see also* www.medicinenet.com/naproxen/article.htm ("Naproxen . . . BRAND NAME: . . . Naprosyn . . . Naproxen belongs to a class of drugs called nonsteroidal antiinflammatory drugs (NSAIDs). Other members of this class include ibuprofen . . . . These drugs are used for the management of mild to moderate pain, fever, and inflammation. . . . Naproxen blocks the enzyme that makes prostaglandins (cyclooxygenase), resulting in lower concentrations of prostaglandins. As a consequence, inflammation, pain and fever are reduced.").

continue with his current medications of "Tramadol & Narposyn." *Doc. 23-11.*

Right after seeing these nurses, Plaintiff filed a series of grievances, sometimes more than one a day. In them he complains of knee pain, having asked for the knee brace but not receiving it, and that he was not seen by medical staff.[8]

---

[8] All of Plaintiff's grievances are numbered, but those numbers do not seem to bear any relationship to the order in which the grievances were filed. *See Doc. 23-54* at 1-8 (grievances filed on May 25, 2007 bear the typed numbers "23079" and "23080; " three grievances filed May 26, 2007 bear descending rather than ascending numbers "23055," "23056," and "23068;" remaining two grievances were filed on different forms that bear a different sequence of "Bates-stamped" numbers 023182, 030001, and 030005)  I therefore refer to the grievances by date.

On May 25, 2007, Plaintiff filed a grievance that does not contain his entire allegation – it complains about his knee pain on his May 22nd medical visit and that "medical staff here has failed in." *Doc. 23-53* at 1.  The same date, he filed another grievance stating that since his "arrival [he] asked for the proper knee brace," misrepresenting that he had "yet to receive any medical attention at all," and asserting that his sister "has brought the proper knee brace to the facility for me but I was never allowed to receive it." *Doc. 23-53* at 2.  On May 26, 2007, he filed three grievances.  Taken together, they allege that:  the previous day he was suffering from knee pain; "medical refused to see" him at "4:45;" he was thus "advised . . . to wait until next shift change . . . at 7:30," when he was "taken to medical at 8[:]30," three other inmates "with minor medical complications [of[ rash, a minor burn and a small abrasion on the hand" were waiting; he "was not seen at all.  Completely refused to be seen;" and a correctional officer was supposed to note the refusal in his log.  *Id.* at 3-5.

It was months before these grievances received a response.  On September 21, 2007, someone made the first response to Plaintiff's grievances from the previous May.  Plaintiff would not be apprised of the determination for another month.  *See Doc. 23-53* at 1-5.  By that time Plaintiff had his brace for four months.  In other words, the prison officials did not begin to evaluate the merits of the grievance until it had mooted.  Also, Plaintiff has been released from prison so he cannot now exhaust.  *See Baldauf v. Garoutte,* 137 Fed. App'x 137, 140-41 (10th Cir. 2005) (administrative remedies have to be "available" to require exhaustion and are not "available" when thwarted by the conduct of prison officials), *cert. denied,* 546 U.S. 1183 (2006); *see also Laubach v. Scibana,* 301 Fed. App'x 832, 836 (10th Cir. 2008) (dismissals for failure to exhaust PLRA remedies are without prejudice).  Also, the grievance policy attached to the Martinez Report was amended after Plaintiff was released from prison, and there is no explanation of that was changed after he left.  *See Doc. 23-54* (affidavit authenticating procedures); *Doc. 23-54* (procedures revised 5/28/08); *Doc. 23-49* (Plaintiff released from prison 4/30/08).  Thus, for either of these independent reasons, I find no merit to the contention that this set of Eight Amendment Claims should be dismissed for lack of exhaustion.

The "provider" did not respond to the chart or see Plaintiff until June 8, 2007.  In the interim, Plaintiff was seen by a nurse for his complaint that his "knee feels like bone on bone."  The nurse observed "deeply compromised ROM [range of motion] Inability to stoop," and, again, referred Plaintiff to a "provider."  *Doc. 23-12.*  Another nurse saw Plaintiff three days later for his compliant of knee pain and swelling.  This nurse noted that Plaintiff "uses knee brace @ home [and] refuses Tramadol x3 weeks [complaining that it was] not relieving pain."  *Doc. 23-13.*  Again, he was referred for a visit with a "provider."  *Id.*  The "provider" saw noted that Plaintiff "requests brace (has)."  *Doc. 23-14.*  The same day, the "provider" sent a "referral form" to "security" authorizing an "ACE [bandage for] duration of stay" and asking that security "bring knee brace (in property) to medical to clear for KOP," *Doc. 23-15.* "KOP" is not defined.

A couple of weeks passed and Plaintiff filed another grievance on June 20, 2007.  He complained that MDC did not "have the resources" to deal with "someone with my medical condition" and requested for an "orthopedic surgeon" to evaluate his knee.  *Doc. 23-53 at 6.*  The same date that the "supervisor" who signed the form received it, he or she also "referred" it to "med" noting a response was due "7/7/07."  *Id.*  Before "medical" responded to the grievance, on July 4, 2007, it sent a "referral form" to "security" indicating that "Bleadsoe Brace to KOP

19

indefinate (sic)."  *Id.*  In other words, Plaintiff was given his brace and was

permitted to use it all the time.  The July 12, 2007 response to the grievance was

that it was "unfounded," and Plaintiff appealed.  *Doc. 23-53* at 6.  There is nothing

in the record indicating that the appeal was ever processed.

That Plaintiff was not happy with the treatment he was receiving and

wanted to see an orthopedist in May does not rise to the level of a constitutional

violation.  *E.g., Duffield v. Jackson,* 545 F.3d 1234, 1239 (10th Cir. 2008) ("However,

the 'contention that he was denied treatment by a specialist is . . . insufficient to

establish a constitutional violation.'  *Ledoux v. Davies,* 961 F.2d 1536, 1537 (10th

Cir. 1992).  The decision that a patient's condition requires a specialist is a decision

about the patient's course of treatment, and 'negligent diagnosis or treatment of a

medical condition do[es] not constitute a medical wrong under the Eighth

Amendment.'  *Ramos,* 639 F.2d at 575.").  Likewise, his preference for Vidocin over

Tramadol is simply a difference of opinion about the proper course of pain-

management treatment.  *E.g., Jennings v. Natrona County Detention Center Medical

Facility,* 175 F.3d 775, 781 (10th Cir. 1999) ("the documents attached to his

complaint reflect he was given medical attention and prescriptions on a number of

occasions. At best, then, his claim amounts to a difference of opinion over the

medical treatment he received. This difference of opinion does not rise to the level

of a constitutional violation."); *Mosley v. Snider,* 10 Fed. App'x 663, 664 (10th Cir. 2001) ("The district court did not err in granting summary judgment on Mosley's inadequate medical treatment claim, which was based on the defendants' refusal to refill a particular prescription medication. . . . the prescription Mosley sought to have refilled was discontinued because a CCF physician determined it was no longer needed, that a different medication was prescribed but Mosley refused to accept it . . . Because Mosley merely disagrees with his prescribed course of treatment, he has not stated an Eighth Amendment claim.").

It is not clear when the prison received the Bledsoe brace.  Even assuming the brace was there from the beginning and there were no impediments to issuing it to him sooner, the records show that the delay was simply negligence.  While he waited for the brace, medical staff was continuously providing him treatment for his knee from the outset.  It prescribed pain relievers and permitted accommodations for his knee pain from the time he entered prison, prescribed an anti-inflammatory when his knee was observed to be swollen, and give Plaintiff an ACE bandage until the clearance for his brace came through.  There is no showing that the delay of perhaps as long as six months "caused either unnecessary pain or a worsening of [Plaintiff's] condition."  *Mata,* 427 F.3d at 755.  Under these circumstances, I find no Eight Amendment violation.

21

## C.  Followup After Hand Injury

The medical records do not show complaints of knee pain again until
September 21, 2007.  This is about the time that the prescription for Percoset was
due to run out.  In early September, Plaintiff "punched a window" and injured his
hand.  He wounded his knuckle, suffered a "greenstick" fracture to one of the
bones in his hand, and was treated at UNM Hospital.  *See Docs. 23-22, 23-23, 23-
25 at 2; 23-27.*  A few weeks after the injury to his hand, Plaintiff filed a grievance
on September 12, 2007 and September 17, 2007, complaining that a correctional
officer refused to call medical for him and that he missed a followup appointment
with UNM.  *See Doc. 23-53 at 7-8.*  Plaintiff was seen by a "provider" on September
25th for this injury, an x-ray was prescribed and taken, and the missed appointment
acknowledged and rescheduled.  *See Doc. 23-27 at 1-3; Doc. 23-28, Doc. 23-29,
Doc. 23-32.*  That ended the medical records where Plaintiff complained about his
hand, and he subsequently "withdrew" his two grievances because the "problem has
been resolved."  *See Doc. 23-53 at 7-8.*

This is precisely one of the reasons why exhaustion of remedies is required –
so inmates and those responsible for their care have the opportunity to resolve their
differences without resorting to court.  *See, e.g., Porter v. Nussle,* 534 U.S. 516, 525

(2002) ("Congress afforded corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.  In some instances, corrective action taken in response to an inmate's grievance might improve prison administration and satisfy the inmate, thereby obviating the need for litigation.").  As such, this Court should not entertain a § 1983 challenge to an issue that has been fully and satisfactorily resolved.  *E.g., Oestriecher v. Wallace,* 2007 WL 4233690 at *4 (E.D. La. 2007) ("The evidence clearly establishes that plaintiff abandoned both grievance number RCC-2006-789 and grievance number RCC-2006-765 prior to completion of the applicable administrative remedy procedure.  In light of that fact, it would violate both the letter and intent of the law to allow him to proceed directly to federal court on his claims.").

## D.  Orthopedist Visit

Plaintiff's renewed complaints about knee pain and swelling, despite using his brace, were renewed in late September 2007.  The "provider" first attended to his hand.[9]  On October 30, 2007, Plaintiff reported to a nurse that "last week" his knee

---

[9]  On September 21, 2007, a nurse observed that Plaintiff had a "slight swelling to R knee . . . able to bend able to bear wt," and referred him to a "provider," who saw Plaintiff four days later on September 25, 2007.  *See Docs. 23-26, 23-27.*  At the September 25th appointment, the "provider" noted that Plaintiff reported his history of knee problems and surgeries, reported that his knee locked several times despite the fact that he was using the Bledsoe brace, and said that he wanted an evaluation and followup for possible additional knee surgery.  *Doc. 23-27* at 1.  The "provider" noted that Plaintiff was "positive" for crepitus and was wearing his brace, and that

buckled, he fell, and something "popped" above his ankle. He had been wearing his brace but was in pain. The nurse referred his to a "provider" to schedule and x-ray of the ankle, which was done the next day. *See Docs. 23-34 - 23-35.* The x-ray did "not show evidence of fracture dislocation or . . . lesions . . . tibia  . . . and ankle visualized is intact . . . ankle . . . no . . . tissue swelling." *Doc. 23-35.*

On November 12, 2007, Plaintiff complained to a nurse of continued pain and swelling in the knee and ankle, which she observed, and referred him to a "provider." *See Doc. 23-36.* On November 16, 2007, the "provider" prescribed a trial of an anti-inflammatory medication, and wanted to refer Plaintiff "to UNM ortho but need[ed] to [review] x-ray." *Doc. 23-37 at 1.* The follow-up visit was scheduled for December 14, 2007, where the provider assessed Plaintiff with "chronic knee instability & pain," was to "continue Darvocet," and was to be referred to "UNM" for his right knee. *See Doc. 23-40 at 1.* The same day, the "Medical Director" approved the "services requested:  orthopedics [right] knee torn ACL & meniscus." *Id.* at 3. The document approving the services contains the

---

there were complications with the his hand healing. *Id.* However, the plan for an orthopedic referral, medicine, and lab work related to the hand injury only. Nothing was mentioned about Plaintiff's knee at that time. *See Docs. 23-27 - 23-29, 23-32.* When Plaintiff asked a nurse for Darvocet for knee pain on October 10, 2007 and again on October 12, 2007, he again was referred to a "provider," who saw Plaintiff on October 16, 2007. The "provider" noted problems with Plaintiff's hand healing properly, and prescribed two weeks worth of Darvocet. *See Docs. 23-32 - 23-33.*

date the appointment took place – three months later on "3-21-08 @ 1:15 pm."

*Id.; see also, e.g., Doc. 23-47* at 1-2.  In the interim, however, Plaintiff continued to

receive his pain medication.  *See Doc. 23-43* ("getting meds OK . . .  on pain med").

Plaintiff filed this action in January 2008, before he was due to see the

specialist.  *See Doc. 1* at 1.  About a month before the scheduled visit, on February

19, 2008, Plaintiff complained of a wound to his chest and said that he had broken

his "ACL brace . . . I need another one . . . been using it since 1992."  *Doc. 23-42* at

1.  An "Interdisciplinary progress notes" sheet dated February 28, 2008 (evidently

written by a "provider" because of the use of the abbreviation "Pt," which

commonly means "patient") states that:

> Pt was seen back 1/08 & wanted me to order a neoprene knee
> brace.  This was done  [patient] received 2/28/08 [illegible]
> when I tried to [illegible] to him in the pod he refused it
> because it wasn't a "ACL' brace.  He wants a brace that he can
> "play handball [illegible]  Explained to him we didn't have or
> could order that kind of brace due to the metal in it.  Pt was
> dissatisfied & told me he would grievance this.

*Doc. 23-45; see also Doc. 23-45* ("medical" sent a "referral form" to someone or

something that is illegible, form states "refused neoprene brace chart.").

On March 18, 2008, Plaintiff requested of a nurse that his Darvocet

prescription be renewed, and he was referred to "provider" to do so.  *Doc. 23-46.*

On March 21, 2008, he had his appointment with UNM, x-rays were taken of both

knees, and Plaintiff was prescribed a "hinged knee brace" and a "follow up MRI." *Doc. 23-47* at 1-1.  The same day, "medical" sent a "referral form" to "security" stating "please allow [inmate] to [illegible] knee brace x 10 days."  *Doc. 23-45.* Four days later, a prison "provider" renewed Plaintiff's Darvocet prescription for sixty days.  *See Docs. 23-48* at 1-2.  Plaintiff was released from prison on April 40, 2008.  *Doc. 23-49.*

Plaintiff's last complaint is about the delay between when he injured his ankle in September and when he finally saw an orthopedist in late March.[10]  As with the knee brace claim, however, the record demonstrates that he was seen, treated, and medicated throughout the time of the delay and there is no showing that the delay "caused either unnecessary pain or a worsening of [Plaintiff's] condition."  *Mata,* 427 F.3d at 755.  Under these circumstances, I find no Eighth Amendment violation.

## E.  Summary

This case is wholly unlike those cases where allegations of delay or medical care were sufficient to support an Eighth Amendment violation.  For example, in *Mata* there was a delay in response to heart attack symptoms and in *Kikumura*

---

[10]  Plaintiff did not file any grievances concerning this complaint, but I will not dismiss this claim without prejudice.  *See supra* note 8.

where the symptoms were inability to stand, vomiting, and seizures.  In *Oxendine v.*
*Kaplan,* a prison doctor and prison medical assistant surgically reattached an
inmate's severed finger at the prison, but when the tissue of the reattached finger
began to turn black and gangrenous, waited for up to a week to seek the assistance
of a specialist.[11]  In *Garrett v. Stratman,* treatment for a shoulder injury sustained in
a fight was delayed for months after the fight, then diagnosed as requiring surgery,
and then surgery was delayed an additional eleven months.[12]

Instead, here the material facts are not in dispute and, at most, this suit
involves a difference of opinion about treatment or delays inherent in coordinating
medical care with outside sources.  On the occasions when Plaintiff sought medical
treatment, he received prompt medical attention and medication to help control
the pain.  Finally, to prevail on the "subjective" portion of the Eighth Amendment

---

[11]  *See* 241 F.3d 1272, 1274 (10th Cir. 2001) ("In his complaint, Oxendine alleged that
Defendants Dr. Barry Kaplan, M.D., the prison physician, and Jose Negron, an assistant to Dr.
Kaplan, were not qualified to perform an emergency re-attachment of Oxendine's right,
middle-finger fingertip after it was accidentally severed when it was caught in Oxendine's cell
door.  Despite their lack of qualification, alleged Oxendine, Defendants refused to obtain outside
specialized medical assistance both before performing the surgery and after Oxendine's injury
exhibited signs of significant worsening in the weeks following the surgery.").

[12]  *See* 254 F.3d 946, 947 (10th Cir. 2001) ("Garrett's shoulder was injured during a prison
yard fight on June 14, 1995.  According to the complaint, his condition was ignored until August
25, 1995, when the shoulder injury was diagnosed by Dr. Jere Sutton, an orthopedic consultant.
Although Dr. Sutton recommended reconstructive surgery, appellant was not transferred to the
United States Medical Center for Federal Prisoners in Springfield, Missouri, for consultation with
an orthopedic surgeon until May 1996, eleven months after the injury.").

test, Plaintiff "must establish that defendant(s) knew he faced a *substantial risk of harm* and disregarded that risk, by failing to take reasonable measures to abate it." *Kikumura,* 461 F.3d at 1293 (internal quotations and citations omitted) (emphasis added).  Nothing in the allegations or *Martinez* Report points to a life-threatening situations, exacerbation of existing medical conditions, lifelong handicap or a permanent loss.  *See Hunt v. Uphoff,* 199 F.3d 1220, 1224 (10th Cir. 1999).

Wherefore,

IT IS HEREBY RECOMMENDED that this action be dismissed with prejudice.

IT IS FURTHER ORDERED that the Clerk substitute "Correctional Medical Services, Inc." for Defendant "Bernalillo County Metropolitan Detention Center Medical Department."

THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 10 DAYS OF SERVICE of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).  A party must file any objections with the Clerk of the District Court within the ten-day period if that party wants to have appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.

_____
UNITED STATES MAGISTRATE JUDGE